**In the United States Court of Appeals
for the District of Columbia Circuit**

**No. 16-1081**

———————

CITY OF BOSTON DELEGATION, *et al.*,
*Petitioners*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent.*

———————

ON PETITION FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION

———————

**Consolidated Matters
Nos. 16-1098 and 16-1103**

———————

**FINAL JOINT OPENING BRIEF OF
PETITIONERS TOWN OF DEDHAM,
MASSACHUSETTS, AND RIVERKEEPER,
INC., *et al.* \***

**\*WITH CITATIONS TO JOINT APPENDIX ADDED**

———————

Carolyn Elefant,
Alexander English
LAW OFFICES OF
CAROLYN ELEFANT, PLLC
2200 Pennsylvania Ave. NW, 4th Fl. E.
Washington, D.C. 20037
(202) 297-6100 | carolyn@carolynelefant.com
*Counsel to Riverkeeper, Inc. and
Environmental & Community Petitioners*
December 15, 2016

Jeffrey M. Bernstein
Rebecca F. Zachas
BCK LAW, PC
271 Waverly Oaks Road
Suite 203
Waltham, MA 02452
617-244-9500
rzachas@bck.com
*Attorneys for Town of
Dedham, Massachusetts*

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| **CITY OF BOSTON DELEGATION,** | ) ) ) ) |
| **and** | ) ) |
| **TOWN OF DEDHAM, MASSACHUSETTS** | ) ) **DOCKET NO. 16-1081** |
| **and** | ) **consolidated with** ) **16-1098, 16-1103** |
| **RIVERKEEPER, INC.,** *et al.* | ) ) ) |
| *Petitioners* | ) ) |
| **v.** | ) ) |
| **FEDERAL ENERGY REGULATORY COMMISSION,** | ) ) ) |
| *Respondent* | ) ) ) |

## PETITIONERS' CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

Pursuant to D.C. Circuit Rules 27(a)(4) and 28(a)(l), Petitioner Town of

Dedham, Massachusetts and Riverkeeper, Inc. ("Riverkeeper"), et al., submit this

joint Certificate as to Parties, Rulings and Related Cases.

## A.    Parties, Intervenors, and *Amici*

### 1.    Petitioners

Petitioners are the City of Boston Delegation (Docket No. 16-1081); the Town of Dedham, Massachusetts (Docket No. 16-1098); and Riverkeeper, Inc., along with numerous other individual and organizational Environmental and Community Petitioners[*] (Docket No. 16-1103).

### 2.    Respondent

The    Respondent is the    Federal Energy Regulatory Commission ("Commission").

### 3.    Intervenors

The following entities have intervened in the above-captioned proceeding in support of the Respondent Commission: Algonquin Gas Tranmission LLC ("Algonquin"); Boston Gas Company d/b/a/ National Grid; Brooklyn Union Gas Company d/b/a/ National Grid NY; Colonial Gas Company d/b/a/ National Grid; Key Span Gas East Corporation d/b/a/ National Grid; Narragansett Electric Company; and National Grid, Niagara Mohawk Corporation d/b/a/ National Grid.

---

[*] These joint petitioners are: Reynolds Hill, Inc.; Sierra Club, Lower Hudson Chapter; Food & Water Watch; Stop the Algonquin Pipeline Expansion (SAPE); Better Future Project; Charles River Spring Valley Neighborhood Association; West Roxbury Saves Energy; Capitalism vs. the Climate; Fossil Free Rhode Island; Jessica Porter; Pramilla Malick; Paul Dunn; Alexandra Shumway; Jan White; Virginia Hickey; Mary McMahon; Audrey Brait; William and Robine Cullinane; Linder Sweeney; and Rickie Harvey.

### 4. *Amici*

At present, no entities have moved for leave to participate as *amici curiae*.

## B. Rulings Under Review

The Town of Dedham and Riverkeeper and the joint Environmental and Community Petitioners seek review of the following orders of Respondent, the Commission: (1) *Algonquin Gas Transmission, LLC*, Order Denying Rehearing and Dismissing Stay Request, Docket No. CP14-96001, 154 FERC ¶ 61,048 (Jan. 28, 2016); and (2) *Algonquin Gas Transmission, LLC*, Order Issuing Certificate and Approving Abandonment, Docket No. CP1496-000, 150 FERC ¶ 61,163 (Mar. 3, 2015).

## C. Related Cases

The case on review has not previously been before this Court or any other court, within the meaning of D.C. Circuit Rule 28(a)(1)(C).

On March 31, 2016, this Court entered an Order consolidating into this matter three petitions for review: Town of Dedham, Massachusetts (16-1098); City of Boston Delegation (16-1081); and Riverkeeper, *et al.* (16-1103). At this time, undersigned counsel is not aware of any other cases related to this case within the meaning of D.C. Circuit Rule 28(a)(1)(C).

Respectfully submitted,

_____

Carolyn Elefant
Alexander J. E. English
LAW OFFICES OF
CAROLYN ELEFANT PLLC
2200 Pennsylvania Ave. NW 4th Fl. E
Washington D.C. 20037
202-297-6100
Carolyn@carolynelefant.com
aenglish@carolynelefant.com
*Counsel to Riverkeeper, Inc. and*
*Environmental and Community*
*Petitioners (Coalition)*

Date:  December 15, 2016

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| **CITY OF BOSTON** )<br>    **DELEGATION,** )<br> )<br>    **and** )<br> )<br>**TOWN OF DEDHAM,** )<br>    **MASSACHUSETTS** )<br> )<br>    **and** )<br> )<br>**RIVERKEEPER, INC.,** *et al.* )<br> )<br>    *Petitioners* )<br> )<br>    **v.** )<br> )<br>**FEDERAL ENERGY REGULATORY** )<br>    **COMMISSION,** )<br> )<br>    *Respondent* )<br> )| **DOCKET NO. 16-1081<br>consolidated with<br>16-1098, 16-1103** |

**RULE 26.1 CORPORATE DISCLOSURE**

Pursuant to Local Rule 15 of the D.C. Circuit Rules and Federal Rule of

Appellate Procedure 26.1, Petitioners submit this Corporate Disclosure Statement

with respect to the petitioners that are corporations or organizational entities.

Riverkeeper, Inc., a not-for-profit corporation organized and existing under the laws of the State of New York, is a member-supported watchdog organization dedicated to protecting the environmental, recreational, and commercial integrity of the Hudson River and its tributaries, and to safeguarding the drinking water supply of nine million New York City and Hudson Valley residents. Riverkeeper, Inc. has no parent companies, and there are no publicly held companies that have a ten percent (10%) or greater ownership interest in Riverkeeper, Inc.

Reynolds Hill, Inc., is a non-profit membership community located in Peekskill and Cortlandt, New York and is directly impacted by the AIM Project. Reynolds Hill is not publicly traded, has no parent companies, and there are no publicly held companies that have a ten percent (10%) or greater ownership interest in Reynolds Hill Inc.

Sierra Club Lower Hudson Chapter is a non-profit organization founded in 1892 with approximately four thousand (4,000) members in Westchester, Putnam and Rockland Counties. Sierra Club Lower Hudson Chapter is not publicly traded, has no parent companies, and there are no publicly held companies that have a ten percent (10%) or greater ownership interest in Sierra Club Lower Hudson Chapter.

Food & Water Watch is a DC-based nonprofit with close to sixty thousand (60,000) supporters in impacted counties. Food & Water Watch is not publicly traded, has no parent companies, and there are no publicly held companies that have a ten percent (10%) or greater ownership interest in Food & Water Watch

Stop the Algonquin Pipeline Expansion (SAPE) is a grassroots, unincorporated affiliation of approximately thirty (30) members in Rockland, Putnam, and Westchester Counties. SAPE is not publicly traded, has no parent companies, and there are no publicly held companies that have a ten percent (10%) or greater ownership interest in SAPE.

Better Future Project is a Cambridge, Massachusetts based nonprofit with 7000 members. Better Project Future is not publicly traded, has no parent companies, and there are no publicly held companies that have a ten percent (10%) or greater ownership interest in Better Future Project.

Charles River Spring Valley Neighborhood Association (CRSV) is an unincorporated association of several hundred homeowners and residents who directly abut, or reside in close proximity to, the West Roxbury Lateral Component of the AIM Project. CRSV is not publicly traded, has no parent companies, and

there are no publicly held companies that have a ten percent (10%) or greater ownership interest in CRSV.

West Roxbury Saves Energy (WRSE) is an unincorporated association comprised of abutters to the West Roxbury portion of the AIM project. WRSE is not publicly traded, has no parent companies, and there are no publicly held companies that have a ten percent (10%) or greater ownership interest in WRSE.

Capitalism vs. the Climate (CvC) is a Connecticut-based unincorporated association with seventeen (17) members impacted by the AIM Project. CvC is not publicly traded, has no parent companies, and there are no publicly held companies that have a ten percent (10%) or greater ownership interest in CvC.

Fossil Free Rhode Island (FFRI) is a thirty (30)-member Rhode Island-based unincorporated association seeking to redress environmental burdens of extreme energy projects. FFRI is not publicly traded, has no parent companies, and there are no publicly held companies that have a ten percent (10%) or greater ownership interest in FFRI.

Respectfully submitted,

_____

Carolyn Elefant
Alexander J. E. English
LAW OFFICES OF
CAROLYN ELEFANT, PLLC
2200 Pennsylvania Ave. NW 4th Fl. E
Washington D.C. 20037
202-297-6100
Carolyn@carolynelefant.com
aenglish@carolynelefant.com
*Counsel to Riverkeeper, Inc. and
Environmental and Community
Petitioners (Coalition)*

Date: December 15, 2016

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iii

GLOSSARY ....................................................................................................... vi

PRELIMINARY STATEMENTS ........................................................................1

STATEMENT OF ISSUES ..................................................................................1

SUMMARY OF ARGUMENT ............................................................................2

STATEMENT OF STANDING ...........................................................................4

   I.   Environmental and Community Petitioners ...................................................4

   II.   Town of Dedham, Massachusetts ...................................................................8

ARGUMENT ......................................................................................................10

I.   THE COMMISSION VIOLATED NEPA BY IMPROPERLY
SEGMENTING THE AIM PROJECT FROM TWO OTHER
INTERCONNECTED PIECES, AND FAILING TO PROVIDE A
MEANINGFUL CUMULATIVE IMPACTS ANALYSIS OF THE
INTERCONNECTED, REASONABLY FORESEEABLE PROJECTS.............10

   A.  Planning and Marketing Overview. ...........................................................10

   B.  The Commission Improperly Segmented the AIM Project from
Atlantic Bridge and Access Northeast. .............................................................17

      1.  The AIM, Atlantic Bridge and Access Northeast Projects are
Cumulative, Connected and Similar Actions. .................................................19

      2.  Logical Termini. .......................................................................................22

      3.  Substantial Independent Utility. ...............................................................24

      4.  Project Timing. .........................................................................................26

i

   C.   FERC Failed to Provide Meaningful Cumulative Impacts Analysis of the Interconnected, Reasonably Foreseeable Projects. .................................27

     1.   Atlantic Bridge and Access Northeast Were Reasonably Foreseeable Infrastructure that FERC Should Have Meaningfully Included in its Cumulative Impacts Analysis.................................................28

     2.   FERC Violated NEPA by Shirking its Duty to Develop a Record on and to Meaningfully Analyze the Reasonably Foreseeable, Interconnected Projects. ..................................................................30

     3.   FERC Violated NEPA by Allowing Algonquin to Time its Reasonably Foreseeable, Interconnected Atlantic Bridge and Access Northeast Projects to Evade the Cumulative Impacts Analysis. ...................37

II.   THE COMMISSION'S RELIANCE ON THE NRC'S CONCLUSIONS AND FINDINGS ON SAFETY WERE ARBITRARY, CAPRICIOUS AND UNSUPPORTED BY SUBSTANTIAL EVIDENCE........41

   A.   Overview of Safety Issues............................................................41

   B.   The Commission Did Not Address Concerns Raised by Experts..............43

     1.   The Commission Improperly Relied on the NRC's Conclusions Because the NRC's Rulings Were Subject to Criticism and the NRC Is Not an Expert on Pipeline Ruptures. ...........................................44

       a. Controversy over NRC Findings ............................................44

       b. NRC Does Not Deserve Deference.......................................45

III.  THE COMMISSION'S ORDER IS ARBITRARY AND CAPRICIOUS BECAUSE IT RELIES ON AN ENVIRONMENTAL REPORT PREPARED BY A THIRD-PARTY CONTRACTOR WITH A CONFLICT OF INTEREST. ..............................................................47

CONCLUSION ....................................................................51

# TABLE OF AUTHORITIES

**COURT CASES:**                                                                    **PAGE**

*B&J Oil & Gas v. FERC*,
   353 F.3d 71 (D.C. Cir. 2004) .................................................................47

*Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*,
   462 U.S. 87 (1983) ...............................................................................27

*Coal. on Sensible Transp., Inc. v. Dole*,
   826 F.2d 60 (D.C. Cir. 1987) ..............................................................22

*Colorado Wild, Inc. v. United States Forest Service*,
523 F. Supp. 2d 1213 (D. Colo. 2007)....................................................50

*Delaware Riverkeeper Network v. FERC*,
   753 F.3d 1304 (D.C. Cir. 2014) ....... 3, 7, 17, 18, 20, 21, 22, 24, 25, 26, 28, 29, 35

*EMR Network v. FCC*,
   391 F.3d 269 (D.C. Cir. 2004) .............................................................46

*Envtl. Def. Fund v. Marsh*,
   651 F.2d 983 (5th Cir. 1981)..........................................................26, 37

*Florida Wildlife Fed'n v. U.S. Army Corps of Eng'rs*,
   401 F. Supp. 2d 1298 (S.D. Fla. 2005)....................................25, 37-38

*Grand Canyon Trust v. FAA*,
   290 F.3d 339 (D.C. Cir. 2002) ..............................................28, 34, 35

*Great Basin Mine Watch v. Hankins*,
   456 F.3d 955 (9th Cir. 2006)...............................................................18

*Hammond v. Norton*,
   370 F. Supp. 2d 226 (D.D.C. 2005) .......................................18, 26, 33

_____

\* Authorities chiefly relied upon are marked with an asterisk

**COURT CASES (continued):** ...................................................................... **PAGE**

*Hanly v. Kleindienst*,
  471 F.2d 823 (2nd Cir. 1972) ...............................................................34

*Horsehead Development Company v. Browner*,
  16 F.3d 1246 (1994) ...............................................................................6

*Louisiana Ass'n. of Independent Producers v. FERC*,
  958 F.2d 1101 (D.C. Cir. 1992) ...........................................................50

*\*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ................................................... 5, 6, 8, 10

*Moreau v. FERC*,
  982 F.2d 556 (D.C. Cir. 1993) ..........................................................5, 9

*Named Individual Members of San Antonio Conservation Soc. v.*
*Texas Highway Dept.*,
  446 F.2d 1013 (5th Cir. 1971) ............................................................38

*National Wildlife Fed'n v. Hodel*,
  839 F.2d 694 (D.C. Cir. 1988) .............................................................6

*\*Natural Resources Defense Council v. Hodel*,
  865 F.2d 288 (D.C. Cir. 1988) ........................................... 27, 34, 35

*Northern Plains Resource Council v. Surface Transp. Bd.*,
  668 F.3d 1067 (9th Cir. 2011) ............................................................29

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation &*
*Dev. Comm'n*,
  461 U.S. 190 (1983) ...........................................................................45

*Piedmont Heights Civic Club, Inc. v. Moreland*,
  637 F.2d 430, 439 (5th Cir. 1981) ................................................. 21-22

*PPL Wallingford Energy v. FERC*,
  419 F.3d 1194 (D.C. Cir. 2005) .........................................................44

**COURT CASES (continued):** ....................................................... **PAGE**

*Sierra Club v. EPA*,
  292 F.3d 895 (D.C. Cir. 2002) ..........................................................5, 6

*Taxpayers Watchdog, Inc. v. Stanley*,
  819 F.2d 294 (D.C. Cir. 1987) ...........................................................18

*\*Washington Gas Light v. FERC*,
  532 F.3d 928 (D.C. Cir 2008) ................................................. 7, 41, 45

*Wilderness Workshop v. BLM*,
  531 F.3d 1220 (10th Cir. 2008)..........................................................18

**ADMINISTRATIVE CASES:**

*Algonquin Gas Transmission, LLC*, Certificate Order
  150 FERC ¶ 61,163 (2015)......................................... 2, 4, 5, 8, 10, 21, 27, 36, 51

*Algonquin Gas Transmission, LLC*, Rehearing Order
  154 FERC ¶ 61,048 (2016).......................................................................
  ....................................2, 4, 8, 17, 19, 21, 22, 23, 24, 25, 29, 32, 36, 41, 43, 45, 51

*Certification of New Interstate Natural Gas Pipeline Facilities*,
  Statement of Policy,
  88 FERC ¶ 61,227 (1999)............................................................. 38, 39
  Order Clarifying Statement of Policy,
  90 FERC ¶ 61,128 (2000).....................................................................39
  Order Further Clarifying Statement of Policy,
  92 FERC ¶ 61,094 (2000).....................................................................39

**STATUTES:**

Natural Gas Act
  *15 U.S.C. § 717f............................................................. 1, 2, 5, 7, 46, 47
  *15 U.S.C. § 717r(b) ............................................................ 5, 8, 46, 51

National Environmental Policy Act
  *42 U.S.C. § 4321, *et seq.* ..........................................................................
  ..............................................1, 2, 3, 5, 7, 10, 17, 18, 26, 27, 30, 33, 34, 37, 38, 40

**REGULATIONS:**

40 C.F.R. § 1501.8(b)(vi) ........................................................................ 33

40 C.F.R. § 1506.5(B) ............................................................................. 49

*40 C.F.R. § 1508.25(a) ................................................................ 3, 17, 19

40 C.F.R. § 1508.7 ..................................................................................28

Circuit Rule 28(a)(7) .................................................................................8

## GLOSSARY

| *Term/Abbreviation* | *Definitions* |
| --- | --- |
| Access Northeast | Access Northeast Project |
| Access Northeast Announcement | Riverkeeper Rehearing Request, Exhibit 4, R.1880, J.A. 1346 |
| AIM | Algonquin Incremental Market |
| Algonquin | Algonquin Gas Transmission, LLC, a subsidiary of Spectra Energy Corporation |
| Atlantic Bridge Announcement | Spectra Open Season Announcement for Atlantic Bridge Project (February 5, 2014) cited in R. 1882, J.A. 1428 n.3; in full at J.A. 1880 |
| Atlantic Bridge | Atlantic Bridge Project |
| CEQ | Council on Environmental Quality |
| Certificate Order | Algonquin Gas Transmission, LLC, CP14-96-000, *Order Issuing Certificate and Approving Abandonment*, 150 FERC ¶ 61,163 (March 3, 2015), R. 1847, J.A. 1252 |

| | |
|---|---|
| Certificate | Certificate of Convenience and Public Necessity |
| *Coalition on Sensible Transportation* | *Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 69 (D.C. Cir. 1987) |
| Commission | Federal Energy Regulatory Commission |
| Cortlandt Comments | Town of Cortlandt, New York, Comments (November 21, 2014), R. 1633, J.A. 658 |
| CRSV | Charles River Spring Valley Neighborhood Association is an unincorporated association of several hundred homeowners and residents of West Roxbury, Massachusetts. |
| Dedham Comments | Corrected Dedham DEIS Comments (September 30, 2014), R. 1348, J.A. 577 |
| DEIS | Draft Environmental Impact Statement, CP14-96-000 (August 6, 2014), R. 865, J.A. 444 |
| *Delaware Riverkeeper* | *Delaware Riverkeeper Network v. FERC*, 753 F.3d 1304, 1315 (D.C. Cir. 2014) |
| Dth/day | dekatherms per day |
| EIS | Environmental Impact Statement |
| *EMR Network* | *EMR Network v. FCC*, 391 F.3d 269 (D.C. Cir. 2004) |
| Entergy | Entergy Nuclear Operations, Inc. |
| EPA | U.S. Environmental Protection Agency |
| FCC | Federal Communication Commission |

| | |
|---|---|
| FEIS | Final Environmental Impact Statement, CP14-96-000 (January 23, 2015), R. 1768, J.A. 745 |
| FERC | Federal Energy Regulatory Commission |
| FWW | Food and Water Watch is a non-profit with approximately 320 members who reside in Peekskill and Cortlandt, New York, and Dedham and West Roxbury, Massachusetts. |
| *Grand Canyon Trust* | *Grand Canyon Trust v. FAA*, 290 F.3d 339, 345 (D.C. Cir. 2002) |
| *Hammond* | *Hammond v. Norton*, 370 F. Supp. 2d 226 (D.D.C. 2005) |
| HDD | horizontal direct drill |
| *Hodel* | *Natural Resources Defense Council v. Hodel, 865 F.2d 288,* 297 (D.C. Cir. 1988) ("*Hodel*") |
| Indian Point | Indian Point Energy Center |
| Kuprewicz Report | Report dated November 3, 2014, by pipeline engineering and safety expert Richard Kuprewicz |
| LNG | liquefied natural gas |
| *Lujan* | *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) |
| Maine PUC | Maine Public Utilities Commission |

| | |
|---|---|
| Maine PUC Proposal | Spectra Proposal submitted to Maine Public Utilities Commission (September 29, 2014), online at http://www.slideshare.net/MarcellusDN/spectra-energy-pipeline-proposal-for-maine-public-utilities-commission |
| Maritimes & Northeast Project | Maritimes & Northeast pipeline owned by Spectra subsidiary Maritimes & Northeast Pipeline, LLC |
| *Marsh* | *Envtl. Def. Fund v. Marsh*, 651 F.2d 983 (5th Cir. 1981) |
| *Moreau* | *Moreau v. FERC*, 982, F.2d 556 (D.C. Cir. 1993) |
| NEPA | National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* |
| NESCOE | New England States Committee on Electricity |
| NESCOE Letter | Spectra Letter to NESCOE (June 27, 2014), online at http://www.nescoe.com/uploads/Spectra_EnhancingElectricReliabilityinNE_27Jun2014.pdf, J.A. 1886 |
| NGA | Natural Gas Act, 15 U.S.C. § 717f |
| NRC | Nuclear Regulatory Commission |
| NRG | National Resource Group |
| OCI | Organizational Conflict of Interest Statement |
| PennEast | PennEast LLC, a major pipeline consortium of which Spectra is a member |

| | |
|---|---|
| Policy Statement | Certification of New Interstate Natural Gas Pipeline Facilities, Statement of Policy, 88 FERC ¶61,227 (Sept. 15, 1999); Order Clarifying Statement of Policy, 90 FERC ¶61,128 (Feb. 9, 2000); Order Further Clarifying Statement of Policy, 92 FERC ¶61,094 (July 28, 2000) |
| Rehearing Order | Algonquin Gas Transmission, LLC, CP14-96-001, *Order Denying Rehearing and Dismissing Stay Request*, 154 FERC ¶ 61,048 (January 28, 2016), R. 2181, J.A. 1782 |
| SAPE | Stop the Algonquin Pipeline |
| Spectra | Spectra Energy Partners, LP, a Houston-based master limited partnership, formed by Spectra Energy Corp. |
| Town | Town of Dedham, Massachusetts |
| Town's Rehearing Request | The Town's Request for Rehearing of the Certificate Order with FERC dated April 2, 2015, R. 1883, J.A. 1664 |
| Yardley Interview | Transcript of *Platt's Online* (August 3, 2014) interview with Spectra's President of Transmission and Storage, William Yardley, R. 1882, J.A. 1491 |

# PRELIMINARY STATEMENTS

The Environmental and Community Petitioners and the Town of Dedham, Massachusetts (the "Town") (altogether the "Petitioners"), join in the jurisdictional statement, statement of the case, standard of review and addendum of statutes and regulations in the Brief of the City of Boston Delegation.

# STATEMENT OF ISSUES

1.  Was the Federal Energy Regulatory Commission's (the "Commission" or "FERC") acceptance of the segmentation of the Algonquin Incremental Market ("AIM") Project ("AIM Project") from the Atlantic Bridge Project ("Atlantic Bridge") and Access Northeast Project ("Access Northeast"), which are geographically, temporally and operationally part of a single pipeline stretching from the Mid-Atlantic region to Canada, and its failure to meaningfully analyze the cumulative impacts associated with all three reasonably foreseeable segments arbitrary, capricious and in violation of the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* ("NEPA") and the Natural Gas Act, 15 U.S.C. § 717f ("NGA")?

2.  Was the Commission's reliance on conclusions by Entergy Nuclear Operations, Inc. ("Entergy"), and the Nuclear Regulatory Commission ("NRC") related to pipeline safety, a matter exclusively within the

Commission's purview and its finding that the project does not jeopardize public safety given its proximity to the Indian Point Energy Center ("Indian Point") arbitrary, capricious and unsupported by substantial evidence?

3.     Did the Commission's reliance on a third-party contractor with a financial interest in construction of the AIM Project violate its own regulations, give rise to potential bias requiring a remand of the Certificate of Convenience and Public Necessity ("Certificate")[1], or at the very least, justify a less deferential standard of review?

## SUMMARY OF ARGUMENT

The Commission's Certificate Order and Rehearing Order granting a Certificate to Algonquin Gas Transmission, LLC ("Algonquin"), for the AIM Project violate the NGA and NEPA, and are arbitrary, capricious and unsupported by substantial evidence in four fundamental ways. First, the Commission improperly segmented the AIM Project by dividing it into three actions, each of which individually may have an insignificant environmental impact, but which

---

[1] Algonquin Gas Transmission, LLC, CP14-96-000, *Order Issuing Certificate and Approving Abandonment*, 150 FERC ¶ 61,163 (March 3, 2015) ("Certificate Order"), R. 1847, J.A. 1252; Algonquin Gas Transmission, LLC, CP14-96-001, *Order Denying Rehearing and Dismissing Stay Request*, 154 FERC ¶ 61,048 (January 28, 2016) ("Rehearing Order"), R. 2181, J.A. 1782.

2

collectively have a substantial impact. Pursuant to NEPA, 40 C.F.R. § 1508.25(a) and *Delaware Riverkeeper Network v. FERC*, 753 F.3d 1304 (D.C. Cir. 2014) ("*Delaware Riverkeeper*"), the Petitioners' analysis clearly demonstrates that the three projects are connected, cumulative and similar actions, and that they have logical termini and substantial independent utility. The timing of the three projects offers further evidence that the three projects are in fact a single expansion project by Algonquin that the Commission should have evaluated in a single environmental impact statement ("EIS").

Second, the Commission failed to take a hard look at and meaningfully analyze the cumulative impacts of the three reasonably foreseeable projects pursuant to NEPA. The record clearly demonstrates that the Commission was well aware of the overall expansion project, but abrogated its duty to develop a complete record and offered only summary conclusions rather than actual analysis of the three projects' cumulative impacts. Further, the Commission allowed Algonquin to time the regulatory review of the three segments to circumvent a meaningful cumulative impacts review by the Commission.

Third, the Commission erroneously relied on findings by Entergy and the NRC that concluded that the AIM Project would not impact safety at Indian Point. Pipeline safety is a matter exclusively within the Commission's purview, and the

3

Commission's failure to conduct independent analysis was arbitrary and capricious.

Fourth, the Commission violated its own regulations by relying on a third-party contractor which had a financial interest in the construction of the AIM Project. Such conflict gives rise to potential bias requiring a remand of the Certificate, or, at the very least, justifies a less deferential standard of review of the Commission's Certificate Order and Rehearing Order. For all of these reasons, the Commission's Certificate Order and Rehearing Order granting Algonquin's Certificate should be vacated and the Certificate denied or, in the alternative, remanded for further proceedings consistent with the Court's order.

## STATEMENT OF STANDING

## I.    ENVIRONMENTAL AND COMMUNITY PETITIONERS.

Riverkeeper Inc. ("Riverkeeper") and the other Environmental and Community Petitioners[2] filed timely motions to intervene and rehearing requests of

---

[2]  A Coalition of Environmental and Community Organizations, Impacted Landowners and Municipalities filed a Request for Rehearing in Docket No. CP14-96-000 on April 2, 2015, with Attachment 1 to that filing listing the names of members of that coalition ("Coalition").

the Commission's Certificate Order[3] and thus, satisfy the jurisdictional requirements of the NGA, 15 U.S.C. § 717r(b).

When a petitioner is "an object of the action (or forgone action) at issue" there should be "little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ("*Lujan*")).

Harm to property owners' aesthetic and environmental well-being constitutes "aggrievement" for purposes of standing under the NGA, even where landowners' property is not directly crossed by the pipeline. *Moreau v. FERC*, 982, F.2d 556, 565 (D.C. Cir. 1993) ("*Moreau*") (finding landowners adjacent to property with pipeline have standing under NEPA and NGA). Applying this standard, individual petitioners Paul Dunn, Mary McMahon, Jan White, William and Robin Cullinane, Linder Sweeney, Alexandra Shumway, Jessica Porter, Virginia Hickey, and Reynolds Hill, Inc. – intervenors below – have standing here because the AIM Project directly crosses their respective properties, exposes them to aesthetic and environmental harm and jeopardizes their safety. Petitioners

---

[3] Riverkeeper Rehearing Request, R. 1880, J.A. 1346; Riverkeeper Motion to Intervene, R. 389, J.A. 436; Appendix A to Certificate Order (listing intervenors), R. 1847, J.A. 1252.

Rickie Harvey and Audrey Brait have standing because they live in West Roxbury, an impacted community, while petitioner Pramila Malick is within the pipeline impact radius.[4]

Organizational standing attaches where a group's members live in communities impacted by the challenged action. *See Horsehead Development Company v. Browner*, 16 F.3d 1246 (1994)(finding standing based on Citizens for A Safe Environment's claim that members lived in communities subject to incidents resulting from mismanagement of used oil); *accord. National Wildlife Fed'n v. Hodel*, 839 F.2d 694, 707 (D.C. Cir. 1988); *see also Lujan* (finding organizational standing if one of group's members has standing).[5]  Riverkeeper, the lead petitioner, is a member-supported watchdog organization dedicated to protecting the environmental, recreational and commercial integrity of the Hudson River and its tributaries.  A significant number of Riverkeeper members depend on the NYC watershed for their drinking water supply, and use and enjoy the Hudson River and its tributaries, and are located along the pipeline route and may

---

[4]  *See* Coalition Rehearing Request, Exh. 1 (listing intervenors and describing respective impacts), R. 1882, J.A. 1476.

[5]  Because standing for the majority of petitioners is "self-evident," individual affidavits are unnecessary and were not submitted.  *Sierra Club v. EPA*, 292 F.3d at 899.

potentially be affected by construction, maintenance and safety considerations.[6]

The remaining organizational petitioners all include at least one member with standing.[7]

This Court can redress harm to Petitioners either by: (1) vacating the Certificate as inconsistent with the public convenience under Section 7 of the Natural Gas Act for failure to protect safety pursuant to *Washington Gas Light v. FERC*, 532 F.3d 928 (D.C. Cir. 2008); or (2) remanding the challenged orders with instructions to conduct a proper NEPA analysis, as in *Delaware Riverkeeper*, 753

---

[6] Riverkeeper Motion to Intervene, R.389, J.A. 436. One of these members, Nancy Vann, is a homeowner in Reynolds Hill, and owns property crossed by the pipeline with substantial damage to Dickey Brook, wetlands and a vernal pool.

[7] Reynolds Hills, Inc. is a community membership association with property bisected by the pipeline; Charles River Spring Valley Neighborhood Association ("CRSV") and West Roxbury Saves Energy are unincorporated associations of several hundred residents of West Roxbury, Massachusetts including Ms. Harvey; Food and Water Watch ("FWW") is a non-profit with approximately 320 members residing in Peekskill and Cortlandt, New York, and Dedham and West Roxbury, Massachusetts, all crossed by the pipeline; Sierra Club Lower Hudson Chapter has among its missions the protection of the environment from pipeline impacts, with 4,000 members who reside in Rockland, Westchester and Putnam Counties which are impacted by the pipeline; Stop the Algonquin Pipeline ("SAPE") is an unincorporated association formed to oppose the AIM Project, with member Courtney Williams living along the pipeline route; Fossil Free Rhode Island, Better Future Project, and Capital versus the Climate, all grassroots organizations with members in the various communities impacted by the pipeline. *See* Coalition Rehearing Request, Exh. 1, R. 1882, J.A. 1476 (listing intervenors and respective impacts).

F.3d at 1309 (remand to consider segmentation and cumulative impacts, notwithstanding that project was completed).

## II.     TOWN OF DEDHAM, MASSACHUSETTS.

The Town also has standing.  Pursuant to 15 U.S.C. § 717r(b), the Town may obtain a review of FERC's Certificate Order and Rehearing Order because it: (1) was an intervening party in the underlying FERC proceeding, Docket No. CP14-96-000; and (2) timely filed a request for rehearing of the Certificate Order with FERC on April 2, 2015 ("Town's Rehearing Request").  Certificate Order at Appendix A (list of intervenors), R. 1847, J.A. 1252; Town's Rehearing Request, R. 1883, J.A. 1664.

The Town fully satisfies all three elements of standing pursuant to Circuit Rule 28(a)(7):   (1) injury-in-fact; (2) causation; and (3) redressability.  *Lujan* at 561.  First, the Town is directly and significantly injured by the AIM Project which involves opening several miles of Town-owned roads (parts of Allied Drive, Rustcraft Road, Elm Street, East Street and Washington Street, and the High/Harris Streets intersection) to lay *new* pipeline into trenches.  Final Environmental Impact Statement, CP14-96-000 (January 23, 2015) ("FEIS") at 2-12, 2-2, 3-26, R. 1768, J.A. 745; Town's Rehearing Request at 1, 4-5, R. 1883, J.A. 1664; Corrected Dedham Draft Environmental Impact Statement ("DEIS") Comments (September

30, 2014)("Dedham Comments") at 1, R. 1348, J.A. 577. The pipeline was also installed underneath Gonzalez Field, a Town-owned municipal park that is used for recreational purposes. FEIS at 3-40 (map), 4-168, R. 1768, J.A. 745. Construction forced the Town to relocate some soccer games from Gonzalez Field. Dedham Comments at 5, R. 1348, J.A. 577; Town's Rehearing Request at 8, R. 1883, J.A. 1664. Given the miles of Town-owned land along the route, the AIM Project imposes significant adverse impacts on the Town during construction by disrupting traffic, creating noise, and affecting business operations. Town's Rehearing Request at 1-2, 4-5, R. 1883, J.A. 1664J.A..

After completion of the AIM Project, the Town will be bisected along busy roads by a high-pressure gas pipeline that poses an ongoing safety risk in the event of an accident or explosion, and a "permanent aesthetic eyesore" that may require future, inconvenient re-opening of the Town roads. *Moreau*, 982 F.2d at 566 (finding that a pipeline's "permanent aesthetic eyesore" and "continuing safety hazards" constituted "injury in fact" sufficient to establish standing by adjacent property owners). The Town's case here is that much stronger than *Moreau* since the pipeline traverses Town-owned land rather than being located on an adjacent easement. Further, the ongoing safety risks will result in financial impacts on the Town, including that the Town must ensure that its first responders are prepared in case of a pipeline-related emergency and will have higher costs for insurance

9

premiums and road repair to hire adequately-insured companies to work on the impacted Town-owned roads.

Further, the Town's injuries are directly traceable to the challenged Commission's orders, in the absence of which Algonquin would not have authority to construct or operate the pipeline in the Town.  *See* Certificate Order at P. 152(A), R. 1847, J.A. 1252.  Finally, the Town's injuries are capable of redress by this Court since the Town's request – that FERC remand its Certificate Order, expand the scope of its environmental examination of the AIM Project, and issue a new order after fully complying with NEPA regulations – would redress its injuries.  *See Lujan* at 561.

## ARGUMENT

**I.  THE COMMISSION VIOLATED NEPA BY IMPROPERLY SEGMENTING THE AIM PROJECT FROM TWO OTHER INTERCONNECTED PIECES, AND FAILING TO PROVIDE A MEANINGFUL CUMULATIVE IMPACTS ANALYSIS OF THE INTERCONNECTED, REASONABLY FORESEEABLE PROJECTS.**

**A.  Planning and Marketing Overview.**

From the start, Spectra Energy Partners ("Spectra") and its wholly-owned subsidiary, Algonquin, conceived of the AIM Project as the gateway piece of a larger infrastructure development comprised of the AIM Project and the Atlantic

Bridge and Access Northeast segments that in concert would move gas from the

Mid-Atlantic up through Canada.[8]



Spectra and Algonquin treated the expansion of all three sections of the

single Algonquin pipeline as one project when planning, marketing, engineering

and siting the project.  Spectra referred to Atlantic Bridge (which also includes the

reversal of flow in the Maritimes & Northeast pipeline owned by Spectra

subsidiary Maritimes & Northeast Pipeline, LLC) as "an extension of the AIM

---

[8]  *See* AIM Map Diagram, Coalition Rehearing Request at 12, R. 1882, J.A. 1404
(from Spectra Open Season for AIM, online at
https://infopost.spectraenergy.com/downloads/AIM%20Open%20Season%20Notic
e.pdf).

concept" rather than as a separate unit.  In fact, Spectra made clear that its decision to break the projects into pieces was to dissipate public opposition that might result if the scope of the full project were disclosed.[9]



---

[9]  Coalition Rehearing Request at 26, R. 1882, J.A. 1393 (citing quote by Spectra official William Yardley to Platts,  *see* Yardley Interview, J.A. 1491("You can [build a new project] incrementally so you don't have to build the entire [project] all at once.  … I know you end up with a lot less potential opposition if you do that.").

As early as the AIM open season in 2011-2012,[10] Algonquin marketed the project as a unified whole comprised of three inextricably interconnected and interdependent pieces: the AIM, Atlantic Bridge and Access Northeast projects. Spectra's marketing slides – which were available during the AIM open season – show that gas entering the system from Marcellus Shale, a natural gas formation, would flow north via the AIM, Atlantic Bridge, and Access Northeast projects and into Canada for export via a liquefied natural gas ("LNG") terminal. By the time Algonquin filed the Application for AIM on February 28, 2014 (R. 321, J.A. 58) plans for Atlantic Bridge and Access Northeast were well underway. *See* discussion *infra*.

Spectra designed the projects as a single unit. A report dated November 3, 2014, by pipeline engineering and safety expert Richard Kuprewicz ("Kuprewicz Report") found that Spectra provided overcapacity in its design for the AIM Project to provide for Atlantic Bridge customers. Town of Cortlandt, New York, Comments (November 21, 2014) ("Cortlandt Comments"), R. 1633, J.A. 658. Specifically, Mr. Kuprewicz opined:

> The attempt to replace segments of the 26-inch pipeline segment with a 42-inch pipeline across Cortlandt are not in sync with the claimed increased gas demands identified in the current AIM FERC filing and

---

[10]  *See* Spectra Holds Open Season for AIM, February 2, 2011, https://pgjonline.com/2011/02/23/spectra-energy-holds-open-season-for-aim-project/ (showing similar regional map).

subsequent DEIS.  *The operator appears to be positioning for further expansions on the Algonquin system and there are still serious bottlenecks on the looped system between the Stony Point and Southeast Compressor Stations that should have been included in this FERC application.*

Even a cursory review of the project maps show that Atlantic Bridge picks up in Yorktown, New York, where the AIM Project abruptly leaves off.

Riverkeeper Rehearing Request, Exh. 5 (Project Maps), R. 1880, J.A. 1346.



Algonquin also used the same third-party contractor, National Resource Group, LLC ("NRG") – which was just revealed as having an alleged potential conflict of

interest due to a financial interest in future work from Spectra – to prepare the environmental review documents for all three projects.[11]

Spectra sequentially developed the three segments (AIM, Atlantic Bridge and Access Northeast) with siting for the next segment overlapping the preceding piece or, in the case of the Maritimes & Northeast Project flow reversal, dependent on the completion of a subsequent segment. On February 28, 2014, Algonquin filed its Application with the Commission to construct the AIM Project and to provide 342,000 dekatherms/day ("Dth/day") of firm transportation service from Ramapo, New York, to various points in New England. R. 321, J.A. 58(with notice of the Application published on March 24, 2014, 79 Fed.Reg. 15987).

By that time, Spectra had already launched an open season for Atlantic Bridge on February 4, 2014, which, similar to the AIM Project, would provide shippers with an opportunity to obtain firm transportation from Ramapo to delivery to New England.[12]

---

[11] *See* Part III, *infra* and *While Reviewing Spectra Energy Gas Pipeline Project, FERC Contractor Did Not Disclose Its Hiring by Spectra for Five Other Projects*, Itai Vardi (July 19, 2016) - 11:58 http://www.desmogblog.com/2016/07/19/while-reviewing-spectra-energy-gas-pipeline-project-ferc-contractor-did-not-disclose-its-hiring-spectra-five-other.

[12] Spectra Open Season Announcement for Atlantic Bridge Project (February 5, 2014), J.A. 1880 ("Atlantic Bridge Announcement"); *see also* Coalition Rehearing Request, Exh. 2 (Timeline of Spectra's development of Northeast infrastructure), R. 1882, J.A. 1393.

On March 31, 2014, a week before the April 8, 2014 deadline for comments on the AIM application (*see* 79 Fed.Reg. 15987), the Atlantic Bridge open season closed. Four months later, by letter dated June 27, 2014, Algonquin outlined for the New England States Committee on Electricity ("NESCOE") its Atlantic Bridge expansion plans.[13] On July 1, 2014 – more than a month before the Commission's release of the AIM DEIS on August 12, 2014 – Algonquin formally announced Access Northeast, which would "complete the AIM/Atlantic Bridge."[14] By September 2014, Algonquin was actively and openly marketing all three projects in a proposal to the Maine Public Utilities Commission ("Maine PUC").[15] FERC's FEIS issued on January 23, 2015, followed one week later on January 30, 2015, by Algonquin's pre-filing application for Atlantic Bridge in Docket No. PF15-12-000. The Commission issued the Certificate for the AIM Project on March 3, 2015. Algonquin filed its pre-filing application for Access Northeast later that same year on November 3, 2015, in Docket No. PF16-1-000.

---

[13] Coalition Rehearing Request at 12, R. 1882, J.A. 1404 (citing Spectra Letter to NESCOE (June 27, 2014) ("NESCOE Letter"), J.A. 1886.

[14] *See* Access Northeast Announcement, attached as Exh. 4 to Riverkeeper Rehearing Request, R. 1880, J.A. 1382.

[15] *See* Spectra Proposal submitted to Maine PUC (September 29, 2014), referenced in Riverkeeper Rehearing Request, Exh. 4 at 1, R. 1880, J.A. 1383 ("Maine PUC Proposal"), *online at* http://www.slideshare.net/MarcellusDN/spectra-energy-pipeline-proposal-for-maine-public-utilities-commission.

The three projects also have serial construction schedules: the AIM Project (2015-16); Atlantic Bridge (anticipated 2017) and Access Northeast (anticipated 2018). Rehearing Order at P. 71, R. 2181, J.A. 1782.

In spite of this evidence, the Commission persisted in concluding that the projects were not improperly segmented, and failed to conduct a meaningful analysis of the cumulative impacts associated with all three sections.

### B. The Commission Improperly Segmented the AIM Project from Atlantic Bridge and Access Northeast.

The Council on Environmental Quality ("CEQ") regulations implementing NEPA require that an EIS include: (1) connected actions, including those that are "interdependent parts of a larger action and depend on the larger action for their justification;" (2) cumulative actions, "which when viewed with other proposed actions have cumulatively significant impacts;" and (3) similar actions, "which when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together." 40 C.F.R. § 1508.25(a). An agency "impermissibly 'segments' NEPA review when it divides connected, cumulative, or similar federal actions into separate pieces under consideration." *Delaware Riverkeeper*, 753 F.3d at 1315 ("the agency's determination of the proper scope of its environmental review must train on the governing regulations, which here means 40 C.F.R. § 1508.25(a)").

17

The purpose for the rule against segmentation is to "prevent an agency from dividing a project into multiple actions, each of which individually has an insignificant environmental impact, but which collectively have a substantial impact." *Wilderness Workshop v. BLM*, 531 F.3d 1220, 1228 (10th Cir. 2008); *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 969 (9th Cir. 2006). In other words, the anti-segmentation rule prevents applicants and agencies from thwarting their NEPA obligations by chopping projects into smaller components in order to avoid considering their collective impact and to "conceal the environmental significance of the project or projects." *Hammond v. Norton*, 370 F. Supp. 2d 226 (D.D.C. 2005) ("*Hammond*"); *see also Taxpayers Watchdog, Inc. v. Stanley*, 819 F.2d 294, 298 (D.C. Cir. 1987) ('Piecemealing' or 'Segmentation' allows an agency to avoid the NEPA requirement that an EIS be prepared for all major federal actions with significant environmental impacts by dividing an overall plan into component parts, each involving action with less significant environmental effects.").

This Court has previously admonished the Commission for impermissibly segmenting its NEPA review as regards natural gas pipelines and ignoring the clear language of the CEQ regulations that require agencies to consider connected, cumulative and similar actions. *See generally Delaware Riverkeeper*, 753 F.3d at 1313–19 (discussing segmentation under NEPA). The Commission, it seems, has

elected to ignore this admonition.  On rehearing, the Commission asserts that, all evidence to the contrary, the AIM, Atlantic Bridge, and Access Northeast projects "are not Cumulative, Connected, or Similar Actions."  Rehearing Order at P. 62, R. 2181, J.A. 1805.

### 1.    The AIM, Atlantic Bridge and Access Northeast Projects are Cumulative, Connected and Similar Actions.

Contrary to the Commission's Rehearing Order, the AIM, Atlantic Bridge and Access Northeast projects fall into all three categories of actions that must be evaluated together in an EIS pursuant to 40 C.F.R. § 1508.25(a).  First, the three projects are connected actions without independent utility, as all are interdependent on the upgrade and expansion of the Algonquin pipeline system which stretches from the Mid-Atlantic to New England.  Four of the six miles of Atlantic Bridge proposed within the New York watershed were originally included in the AIM Project proposal and later separated into different project proposals.  Riverkeeper Rehearing Request at 14-16, R. 1880, J.A. 1359-1361.

That the AIM Project was never intended as a stand-alone unit is corroborated by the Kuprewicz Report observing that the AIM Project was poised for further expansion.  Cortlandt Comments at Kuprewicz Report, R. 1633, J.A. 658.  Another reviewing agency, the U.S. Army Corps of

Engineers, agreed, commenting that "[i]t is unclear as to whether the Atlantic Bridge Project is fundamentally just an expansion of the AIM facilities."[16]

The connection between the projects is also apparent in Spectra's open access materials for the last leg, the Access Northeast Project. There, Spectra revealed that "the AIM expansion project will begin to de-bottleneck the pipelines system by winter of 2016, helping to enhance reliability and reduce natural gas volatility in New England." Riverkeeper Rehearing Request, Exh. 5, R. 1880, J.A. 1387. Spectra also spoke of the three projects' respective capacity collectively; for example, noting in open access documents, that Access Northeast, when combined with the AIM Project and Atlantic Bridge, would increase capacity on the system by 150 percent. *Id*. at Exh. 4, J.A. 1383.

As in *Delaware Riverkeeper*, the projects are linear, further demonstrating their interconnectedness. *See* Diagrams, Part I.A, s*upra.* The pipeline will deliver natural gas from Marcellus Shale from a start point in Ramapo, New York, and deliver it to the Maritimes & Northeast Project via a direct path through New York, Connecticut, Rhode Island and Massachusetts. The projects are also closely

---

[16] *See* Coalition Rehearing Request, R. 1882, J.A. 1419 (quoting Corps of Engineers DEIS Response (October 6, 2014), R. 1430).

connected in time with only one year between construction schedules, and share a single third-party contractor. *See* Discussion, Part I.A., *supra*.

Second, the projects are cumulative actions. They affect the same resources in the same area and combined incremental effects have the potential to be cumulatively significant. *See* Part I.C., *infra* (cumulative impacts discussion). The Commission itself acknowledged that the AIM Project and Atlantic Bridge are cumulative actions with facilities in the same area. Certificate Order at P. 118, R. 1847, J.A. 1291-92. Similarly, Access Northeast is also being constructed in the same area, during the same timeframe and will affect many of the same areas as the AIM Project and Atlantic Bridge.

Finally, the AIM Project, Atlantic Bridge and Access Northeast are similar projects. All are large interstate pipelines transporting shale gas to the Northeast, rely on the same third-party contractor and serve some of the same customers. *See id.* at P. 75, R. 2181, J.A. 1808 (noting overlap in project shippers for all three projects). Because the projects are cumulative, connected and similar, the Commission erred in segmenting the projects for environmental review.

In evaluating the appropriate scope of an EIS and whether projects are "connected, cumulative and similar," this Court and others consider factors as whether the proposed segment "(1) has logical termini, (2) has substantial independent utility, (3) does not foreclose the opportunity to consider alternatives,

and (4) does not irretrievably commit federal funds for closely related projects."

*Delaware Riverkeeper,* 753 F.3d at 1316; *Piedmont Heights Civic Club, Inc. v. Moreland*, 637 F.2d 430, 439 (5th Cir. 1981). The first two – logical termini and substantial independent utility – are analyzed below, along with project timing.

## 2.    Logical Termini.

The Commission attempts to avoid the "logical terminus" criterion by equating the AIM Project, Atlantic Bridge, and Access Northeast collectively with the "interstate pipeline grid." Rehearing Order at P. 47, R. 2181, J.A. 1799-1800 ("[i]t is inherent in the very concept of" the interstate pipeline grid 'that each segment will facilitate movement in many others; if such mutual benefits compelled aggregation, no project could be said to enjoy independent utility.'") (quoting *Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 69 (D.C. Cir. 1987). As this Court has previously informed the Commission, *Coalition on Sensible Transportation* does not apply to pipeline construction that is "physically interdependent." *Delaware Riverkeeper*, 753 F.3d at 1316.

The Commission also asserts that the three projects are not "physically connected." Rehearing Order at P. 70, R. 2181, J.A. 1806-07. Yet, this conclusion flies in the face of the fact that Atlantic Bridge and Access Northeast "may physically overlap or abut with AIM Project facilities." *Id*. at P. 51; Cortlandt Comments at Kuprewicz Report, R. 1663, J.A. 658 (showing that the AIM Project

22

overcompensated in anticipation of Atlantic Bridge).[17]  Both Atlantic Bridge and

Access Northeast will involve further modifications to the Stony Point and Chaplin

Compressor Stations (part of the AIM Project), and will require pipeline

installations in Westchester County, New York; Fairfield County, Connecticut; and

Norfolk County, Massachusetts where AIM is located.  Rehearing Order at P. 70,

R. 2181, J.A. 1806-07.  Similarly, the AIM Project and Atlantic Bridge will share a

supply point at Ramapo, New York.  *Id.*.  The AIM Project also picks up where

Atlantic Bridge leaves off.  *Compare* J.A. 1247 *with* J.A. 1248.

The Commission simply does not explain how projects that "physically

overlap or abut" as a single, continuous pipeline are nevertheless not "physically

connected."  Rehearing Order at P. 51, R. 2181, J.A. 1801.  As yet another

example of the Commission's lack of division along rational end points, "an early

plan of the AIM Project included some modifications that are now part of the

Atlantic Bridge Project."  *Id.* at P. 78, R. 2181, J.A. 1809.  It seems highly unlikely

that such modifications could be interchangeable between projects if the projects

are not connected.

---

[17]  The Commission's response to the Kuprewicz Report is that hydraulic models
confirm the AIM Project design was appropriately sized for shippers, but those
models are not listed in the Certification of the Record.  Rehearing Order at P. 76,
R. 2181, J.A. 1782.  Moreover, the Commission's finding begs the question
because the design could be both appropriate for shippers, but still overbuilt in
anticipation of Atlantic Bridge.

### 3. Substantial Independent Utility.

The "commercial and financial viability of a project when considered in isolation from other actions is potentially an important consideration in determining whether the substantial independent utility factor has been met. *Delaware Riverkeeper*, 753 F.3d at 1316. As the Commission admits, both Atlantic Bridge and Access Northeast are physically and financially interconnected with the AIM Project. *See* Rehearing Order at P. 51, R. 2181, J.A. 1782. Moreover, as in *Delaware Riverkeeper*, Atlantic Bridge and Access Northeast were designed "in *express contemplation* of the synergies to be obtained between" them and the AIM Project, such that the AIM Project's utility "is inextricably intertwined with the other [two] improvement projects." 753 F.3d at 1317; Rehearing Order at P. 49-53, R. 2181, J.A. 1800-02. For that reason, Spectra jointly marketed the projects to customers, promoting them as a single path from the Mid-Atlantic to New England and Canada. *See supra* at 13-15.

Nevertheless, the Commission relies on the existence of shipping contracts to conclude that each project has "independent utility and will serve a distinct transportation purpose." Rehearing Order at P. 75, R. 2181, J.A. 1808. This is so even though Algonquin executed all contracts for shipping, with substantial overlap in shippers between the various projects. *Id.* at n.102 and accompanying

text.  FERC apparently believes that this evidence of "specific customer demand" is sufficient to withstand all scrutiny.  *Delaware Riverkeeper*, 753 F.3d at 1317.

This Court has emphasized that "[t]o interpret the 'substantial independent utility' factor to allow such fractionalization of interdependent projects would subvert the whole point of the rule against segmentation."  *Id.*; *see also Florida Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 401 F. Supp. 2d 1298, 1315 (S.D. Fla. 2005) ("… the concept of 'independent utility' should not be manipulated to avoid significance or 'troublesome' environmental issues, in order to expedite the permitting process.").  In this regard, the Commission's conclusory rejection of the Coalition's arguments that Algonquin submitted its application prematurely to keep the AIM Project a few steps ahead and separate from subsequent segments to avoid environmental review misses the point.  The Commission suggests that, if Algonquin's AIM application were as deficient as petitioners' contend, it would have been rejected; instead, it was accepted.  Rehearing Order at P. 74, R. 2181, J.A. 1807-08.  Equating "patent" deficiencies in an application with *any* deficiency in an application serves as a dodge, which the Commission used to avoid meaningfully addressing the questions of whether Algonquin jumped the gun in submitting the AIM Project quickly to avoid adequate environmental review.

### 4.    Project Timing.

While NEPA "does not require agencies to commence NEPA reviews of projects not actually proposed," agencies are nevertheless "obliged to take into account other 'connected' or 'similar' projects" when conducting NEPA reviews. *Delaware Riverkeeper*, 753 F.3d at 1318.  Courts have the power "to prohibit segmentation or require a comprehensive EIS for two projects, even when one is not yet proposed, if an agency has egregiously or arbitrarily violated the underlying purpose of NEPA." *Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 999 n.19 (5th Cir. 1981) ("*Marsh*").  In this instance, FERC bent over backwards to avoid fulfilling the underlying purpose of NEPA.

The Commission apparently believes that physically interlinking projects that are proposed and planned for sequential construction within three years of one another do not share a temporal nexus.  This Court in *Delaware Riverkeeper* gave a *decade* of temporal separation as an example of interrelated projects having independent utility.  753 F.3d at 1318.  As in *Hammond*, 370 F. Supp. 2d 226 (D.D.C. 2005), the sponsoring entity(ies) behind the projects are on record[18] as favoring incremental upgrades, as they "end up with a lot less potential opposition" under such an approach.  The Commission was clearly aware of the planned,

---

[18]  *See* Yardley Interview, quoted in Coalition Rehearing Request at 26, R. 1882, J.A. 1418.

sequential expansions of the Algonquin pipeline through the projects. As already discussed, the record shows that the projects are functionally interdependent and geographically proximate, and the proposed timing of each project only reinforces the need to consider the cumulative environmental impact of all three. Accordingly, the Commission is obligated to consider all three projects as the unified whole that they are and its failure to do so warrants vacating and remanding the Certificate for violating NEPA.

### C. FERC Failed to Provide Meaningful Cumulative Impacts Analysis of the Interconnected, Reasonably Foreseeable Projects.

Pursuant to NEPA, FERC is required "to consider the cumulative impacts of proposed actions." *Natural Resources Defense Council v. Hodel, 865 F.2d 288, 297* (D.C. Cir. 1988) ("*Hodel*"). FERC failed to take a "hard look" at the cumulative impacts of the AIM Project in conjunction with two other interconnected and reasonably foreseeable projects, Atlantic Bridge and Access Northeast, and failed to provide a reasoned basis for its determination that the cumulative impacts were insignificant.[19] *Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983) (requiring federal agency under NEPA

---

[19] Commenters clearly requested that FERC evaluate the cumulative impacts of the AIM Project together with Atlantic Bridge and Access Northeast. *See* Certificate Order at P. 112, R. 1847, J.A. 1298.

to take a "hard look" at the environmental consequences of a major action prior to

undertaking it).

> **1.** **Atlantic Bridge and Access Northeast were Reasonably Foreseeable Infrastructure that FERC Should Have Meaningfully Included in its Cumulative Impacts Analysis.**

FERC must evaluate cumulative impacts, which are defined by the CEQ as:

> the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7. A "meaningful cumulative impacts analysis" must identify:

> (1) the area in which the effects of the proposed project will be felt; (2) the impacts that are expected in that area from the proposed project; (3) other actions — past, present, and proposed, and reasonably foreseeable — that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate.

*Delaware Riverkeeper*, 753 F.3d at 1319 (quoting *Grand Canyon Trust v. FAA*,

290 F.3d 339, 345 (D.C. Cir. 2002) ("*Grand Canyon Trust*")).

Atlantic Bridge and Access Northeast were reasonably foreseeable projects

that FERC should have fully included in its cumulative impacts analysis. FERC

conceded on rehearing that these two projects are reasonably foreseeable for

purposes of the cumulative impacts analysis.  Rehearing Order at P. 62, R. 2181,

J.A. 1805.  In *Delaware Riverkeeper*, the Court held that "the three Eastern Leg

upgrade projects preceding and following the Northeast Project were clearly 'other

actions – past, present, and proposed, and reasonably foreseeable.'"  753 F.3d at

1319.  In that case, one of the three upgrade projects, the MPP project, had not yet

filed its application with FERC prior to FERC issuing the Environmental

Assessment ("EA") on November 21, 2011.  The MPP application was later filed

in Docket No. CP12-28-000 on December 9, 2011, without a pre-filing application.

Atlantic Bridge and Access Northeast were similarly timed as the MPP project in

that the FEIS issued on January 23, 2015, and the Atlantic Bridge pre-filing

application followed one week later on January 30, 2015 in Docket No. PF15-12-

000 while the Access Northeast pre-filing was made later that same year on

November 3, 2015 in Docket No. PF16-1-000.[20]

FERC clearly knew or should have known when it issued the DEIS on

August 6, 2014 that Algonquin planned serial, interconnected upgrades on the very

same pipeline system in the very same region of influence.  Spectra had formally

---

[20]  Projects need not have applications on file to be considered reasonably
foreseeable.  *See Northern Plains Resource Council v. Surface Transp. Bd.*, 668
F.3d 1067, 1078 (9th Cir. 2011) (stating that "reasonably foreseeable future actions
need to be considered even if they are not specific proposals").

announced Atlantic Bridge and its associated open season on February 5, 2014, and Access Northeast on July 1, 2014.[21]  Both projects were clearly reasonably foreseeable and should have been meaningfully included in FERC's cumulative impacts analysis.

Instead, however, the record shows that FERC included Atlantic Bridge only on a limited, inadequate basis and simply mentioned (rather than evaluated) Access Northeast.  *See, e.g.,* FEIS at 4-282 – 4-304, R. 1768, J.A. 1180 – 1202.  The record is wholly lacking in detail on these two projects because FERC: (1) abrogated its duty to develop a record on and to meaningfully analyze the reasonably foreseeable, interconnected projects under NEPA; and (2) allowed Algonquin to time its projects to evade a meaningful cumulative impacts analysis.

> **2.     FERC Violated NEPA by Shirking its Duty to Develop a Record on and to Meaningfully Analyze the Reasonably Foreseeable, Interconnected Projects.**

FERC failed to properly develop the record below on and to meaningfully evaluate Atlantic Bridge and Access Northeast.  In the DEIS, FERC acknowledged that the AIM Project and Atlantic Bridge involved the same region of influence,

---

[21]  *See* Atlantic Bridge Announcement, R. 1882, J.A. 1393; Access Northeast Announcement, attached to Riverkeeper Rehearing Request at Exh. 4, R. 1880, J.A. 1382; *see also* NESCOE Letter, Coalition Rehearing Request at 12, R. 1882, J.A. 1404; Maine PUC Proposal, attached to Riverkeeper Rehearing Request at Exh. 4 at 1, R. 1880, J.A. 1383; Coalition Rehearing Request at Exh. 2 (Project Development Table), R. 1882, J.A. 1483.

and that, "[i]f the Atlantic Bridge Project gets constructed, air emissions during operation of compressor stations would overlap with the operational air emissions of the AIM Project." DEIS at 4-272, R. 865. Yet, FERC failed to include Atlantic Bridge in Table 4.13-1 of the DEIS, and summarily concluded that: (1) "[t]he specific details about the Atlantic Bridge Project are currently not developed and no applications have been filed;" and (2) because "the Atlantic Bridge Project would not occur at the same time as the AIM Project, and because details are not known, it is not considered further in this analysis." *Id*. FERC entirely failed to even mention Access Northeast in the DEIS. Nevertheless, at the time of the DEIS issuance, Spectra had clearly announced that the AIM Project was part of a more expansive, systematic upgrade of Algonquin's pipeline system in the northeast with Atlantic Bridge and Access Northeast.[22]

In the FEIS, FERC continued to inadequately limit its evaluation of Atlantic Bridge. While FERC included that project in Table 4.13-1 and in certain resource sections of the FEIS, the information was limited to conclusory statements. FEIS at 4-273–75, 4-284–88, R. 1768, J.A. 1171-73, J.A. 1182-86. Only one week later, on January 30, 2015, Algonquin filed its pre-filing application with FERC. *See, e.g.*, J.A. 1246-51. FERC also continued to ignore Access Northeast and did not

---

[22] *See supra* note 21.

include it in Table 4.13-1 or any resource sections of the FEIS. *See supra* note 21. Instead, the FEIS concluded that, since construction of Access Northeast "would not occur at the same time as the AIM Project, and because details are not known, it is not considered further in this analysis." FEIS at 4-290, R. 1768, J.A. 1188. In its Rehearing Order, the Commission provided that "[w]ithout more detail on project facilities or locations, Commission staff could not determine whether the Access Northeast Project would result in cumulative impacts within the same project area or geographic scope as the AIM Project." Rehearing Order at P. 145 (citing FEIS at 4-283, R. 1768, J.A. 1181), R. 2181, J.A. 1834-35.

The FEIS makes it plain that FERC knew Algonquin would be in a position to seek regulatory approvals that same year (2015) for Atlantic Bridge and Access Northeast with the goal of constructing and placing the facilities in service in 2017 and 2018, respectively. FEIS at 4-290, R. 1768, J.A. 1188. Despite that knowledge, following issuance of the DEIS and prior to issuance of the FEIS, FERC did not include in any of its data requests to Algonquin – including one on January 16, 2015, just a week prior to issuance of the FEIS and two weeks prior to submittal of the Atlantic Bridge pre-filing application – any questions seeking updated information on Atlantic Bridge and Access Northeast. *See* R. 1716, J.A. 719; *see also* R. 1663, J.A. 701; R. 1639, J.A. 690. For its part, Algonquin filed several supplemental responses generally involving segmentation in between

issuance of the DEIS and FEIS, but rather than providing any updated information

on Atlantic Bridge (even on January 21, 2015, a mere two days away from its pre-

filing application) or Access Northeast, Algonquin repeatedly cited back to an

older, generic supplemental response on October 14, 2014. *See* Algonquin Data

Responses, R. 1463 at 7-8 (Oct. 14, 2014), J.A. 609; R. 1674 at Response No. 5(iii)

(Dec. 23, 2014), J.A. 716-17; R. 1753 at Response 4 (Jan. 21, 2015), J.A. 734.

FERC had a duty to critically review Algonquin's limited information, rather

than accepting it at face value. *See Hammond*, 370 F. Supp. 2d at 251 (finding

NEPA violation where agency "unquestionably accept[ed]" and failed to seek

substantiation of company's self-serving and unreliable statements).  However,

FERC failed to fully evaluate Atlantic Bridge and Access Northeast, and to meet

its obligation to provide the public with a FEIS that allows full evaluation of the

project.  In addition, it was within FERC's authority to delay issuance of the FEIS

until it was able to conduct a meaningful evaluation of the cumulative impacts, but

it did not do so.  *See* 40 C.F.R. § 1501.8 (b)(vi).

FERC should have determined from the record that Algonquin's three

upgrade projects would have a larger impact if the individual actions are allowed to

accumulate.  The AIM Project, Atlantic Bridge and Access Northeast share the

same region of influence, would re-disturb some of the same project land because

of the serial, yearly construction projects, and greatly add to the capacity of

Algonquin's existing system.  FEIS at 4-290-91, R. 1768, J.A. 1188-89.  Atlantic

Bridge could add up to 600,000 Dth/day of additional capacity, almost twice the

size of the AIM Project.  *See* NESCOE Letter, Coalition Rehearing Request at 12,

R. 1882, J.A. 1404.  Access Northeast in turn would more than double the capacity

provided by the AIM Project and Atlantic Bridge, and would interconnect with an

LNG terminal to export gas overseas.  *See* Riverkeeper Rehearing Request, Exh. 4

(graphic showing capacity increase), R. 1880, J.A. 1382.  Spectra's materials stated

that Access Northeast will complement its Algonquin and Maritimes pipelines by

up to 1,000,000 Dth/day of natural gas per day.  *See id.*; *see also* Coalition

Rehearing Request at Exh. 2 (Table of Project Development), R. 1882, J.A. 1489.

In addition, FERC failed to adequately support its conclusions that Atlantic

Bridge and Access Northeast do not result in significant cumulative impacts.  An

agency must provide a reasoned explanation to support its conclusions rather than

mere recitation of conclusory statements to avoid its decision being arbitrary and

capricious.  *Hodel* at 299 (stating that "perfunctory references do not constitute

analysis useful to a decisionmaker in deciding whether, or how, to alter the

program to lessen cumulative environmental impacts.").  NEPA requires such an

analysis because "[e]ven a slight increase in adverse conditions . . . may sometimes

threaten harm that is significant.  One more factory … may represent the straw that

breaks the back of the environmental camel."  *Grand Canyon Trust*, 290 F.3d 343

(quoting *Hanly v. Kleindienst*, 471 F.2d 823, 831 (2nd Cir. 1972)).  In *Hodel*, the

Court found that:

> Although the FEIS contains sections headed "Cumulative Impacts," in truth, nothing in the FEIS provides the requisite analysis. … The few times the FEIS *does* discuss the [cumulative impact], it makes only conclusory remarks, statements that do not equip a decisionmaker to make an informed decision about alternative courses of action or a court to review the [Environmental Protection Agency] Secretary's reasoning.

*Hodel* at 298.

In the instant case, FERC's abbreviated, conclusory statements in its DEIS

and FEIS provided an inadequate analysis of the cumulative impacts, similar to

*Delaware Riverkeeper*, where this Court held that:

> FERC's EA for the Northeast Project states, in conclusory terms, that the connected pipeline projects were "not expected to significantly contribute to cumulative impacts in the Project area."  ...  This cursory statement does not satisfy the test enunciated in *Grand Canyon Trust*.  The EA also contains a few pages that discuss potential cumulative impacts on groundwater, habitat, soils, and wildlife, but only with respect to the Northeast Project.  It is apparent that FERC did not draft these pages with any serious consideration of the cumulative effects of the other project upgrades on the Eastern Leg of the 300 Line.  In light of the close connection between the various sections of the line that have been upgraded with new pipe and other infrastructure improvements, FERC was obliged to assess cumulative impacts by analyzing the Northeast Project in conjunction with the other three projects.

*Delaware Riverkeeper* at 1319-20.  In the present case, FERC's conclusory

statements similarly fail to satisfy the test enunciated in *Grand Canyon Trust*, and

do not result in meaningful evaluation of the cumulative effects of the other two project upgrades.  FERC did not support its tenuous conclusions with concrete evidence or actual analysis, but instead suggested that the cumulative impacts are self-evidently insignificant.  For example, the FEIS stated that "it is likely the Atlantic Bridge Project would have as much or more operational emissions than the AIM Project."  FEIS at 4-300, R. 1768, J.A. 1198.  FERC then stated that it "[does] not *believe* the effect on regional air quality would be significant."  *Id.* (emphasis added)J.A..  However, the Commission did not undertake an analysis to definitively rule out significant cumulative impacts, relying instead on nothing more than its conclusory beliefs and assumptions.

In addition, FERC repeatedly and automatically assumes that no significant cumulative impacts may result from these three projects simply because their construction periods would not overlap and are spaced one year apart.  FEIS at 4-290, 5-19, ES-9, R. 1768, J.A. 1188, 1221, 777; Certificate Order at P. 118, R. 1847, J.A. 1291-92; Rehearing Order at P. 144-45, R. 2181, J.A. 1834-35.  For example, regarding geology, FERC concluded without adequate basis that there would be no significant cumulative impacts because, "[a]lthough many of the same general areas would be affected, the temporal scale of the projects is different. … [T]he disturbed areas would be restored prior to any start of the Atlantic Bridge Project…"  FEIS at 5-18, R. 1768, J.A. 1220.  The public is left to take that

36

conclusion at face value rather than seeing it supported by actual evidence. The cumulative impacts evaluation does not contain *any* analysis on the impacts of re-disturbing the same areas within one year's time, nor one year being sufficient recovery and restoration time for each of the resources.

>    3.    **FERC Violated NEPA by Allowing Algonquin to Time its Reasonably Foreseeable, Interconnected Atlantic Bridge and Access Northeast Projects to Evade the Cumulative Impacts Analysis.**

Moreover, as discussed in Part I.B., the Court should prohibit segmentation and require FERC to conduct a meaningful investigation of the cumulative impacts. *See Marsh* at 999 n.19. By proceeding with its environmental review when it was fully aware of the serial, interconnected and reasonably foreseeable upgrades, FERC allowed Algonquin to circumvent a meaningful cumulative impacts evaluation under NEPA, and in doing so FERC failed to comply with NEPA requirements.

The timing of the three projects raises the question whether Algonquin attempted to manipulate the NEPA regulatory scheme by undertaking three different upgrades (rather than one project) and spacing out the filing of project applications with FERC to prevent it from conducting a meaningful, full-scale

cumulative impacts analysis.[23]  *See Florida Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 401 F. Supp. 2d 1298 (S.D. Fla. 2005) (agency action precluded ability to thoroughly evaluate alternatives) (citing *Named Individual Members of San Antonio Conservation Soc. v. Texas Highway Dept.*, 446 F.2d 1013 (5th Cir. 1971)).  As mentioned above, Algonquin initiated the Atlantic Bridge pre-filing application on January 30, 2015, a mere week after the FEIS for the AIM Project issued, and only a few months after that the Access Northeast pre-filing application followed on November 3, 2015.  FERC must not permit pipeline companies to stage interconnected upgrade plans in a manipulative manner, all the while ignoring the broader, regional impacts of the overall infrastructure upgrade project by limiting what is included in the cumulative impacts analysis.  The line between providing flexibility and economic options on the one hand and manipulation on the other may not always be a bright one, but here FERC cannot simply ignore this kind of manipulation of NEPA by a pipeline company.  In this case, that manipulation clearly limited the information FERC used in its cumulative impacts evaluation and prevented FERC from taking a hard look at the impacts of the AIM Project in conjunction with Atlantic Bridge and Access Northeast.

---

[23]  *See* Yardley Interview, J.A. 1491; *also* Cortlandt Comments at Kuprewicz Report at 7 (presenting evidence that the AIM Project results in the need for further expansion), R. 1633, J.A. 665.

FERC also violates its own 1999 Statement of Policy in Docket No. PL99-3-000 by allowing pipeline companies to evade the NEPA process by timing their applications to prevent a full-scale cumulative impacts review. *See Certification of New Interstate Natural Gas Pipeline Facilities*, Statement of Policy, 88 FERC ¶ 61,227 (Sept. 15, 1999); Order Clarifying Statement of Policy, 90 FERC ¶ 61,128 (Feb. 9, 2000); Order Further Clarifying Statement of Policy, 92 FERC ¶ 61,094 (July 28, 2000) ("Policy Statement"). FERC recognized in its Policy Statement that the certificate process is designed to take concerns of landowners and communities into account and mitigate those concerns where feasible, all the while "foster[ing] competitive markets, protect[ing] captive customers, and avoid[ing] unnecessary environmental and community impacts while serving increasing demands for natural gas." Policy Statement at 61,743. FERC's Policy Statement provides that:

> Commission policy should give the applicant an incentive to file a complete application that can be processed expeditiously and to develop a record that supports the need for the proposed project and the public benefits to be obtained. Commission certificate policy should also provide an incentive for applicants to structure their projects to avoid, or minimize, the potential adverse impacts that could result from construction of the project.

Policy Statement at 61,743. When FERC allows pipelines, like Algonquin, to stage its overall project in different proceedings, in particular here where

39

construction projects are separated by only one year, it fails to provide the pipeline that proper incentive. The results of that failure range from allowing such segmentation to interfere with FERC's ability to effectively plan pipelines on a regional (and national) basis to harming the public's ability to evaluate the overall cumulative impacts of a project. Landowners and communities should not have to participate in up to three (here, FERC Docket Nos. CP14-96-000 (AIM Project); PF15-12-000 (Atlantic Bridge); PF16-1-000 (Access Northeast)) lengthy, resource-heavy proceedings (instead of one combined proceeding) to protect their interests. Requiring the pipeline to wait a short period of time to fully develop the interconnected segments of its overall upgrade is a fair balance against those landowner and community interests. Accordingly, FERC fails to protect the public as well as the landowners and communities, and to satisfy its own Policy Statement as well as NEPA when it allows pipelines to time applications such that the NEPA process becomes nothing more than a farce where the cumulative impacts are by no means fully analyzed.

## II.   THE COMMISSION'S RELIANCE ON THE NRC'S CONCLUSIONS AND FINDINGS ON SAFETY WERE ARBITRARY, CAPRICIOUS AND UNSUPPORTED BY SUBSTANTIAL EVIDENCE.

### A.   Overview of Safety Issues.

When evaluating whether a project is in the public convenience and necessity, the Commission has an obligation to ensure that the project will not jeopardize public safety.  *See Washington Gas Light v. FERC*, 532 F.3d 928 (D.C. Cir. 2008) (remanding certificate based on Commission's failure to show, based on substantial evidence, that LNG facility could be safely constructed); *also* Boston Delegation Br. 34-35 (discussing criteria for evaluating projects).

The AIM Project raises serious public safety issues.  Approximately 2,159 feet of the AIM Project will run through property that is part of Indian Point, a nuclear power plant owned by Entergy.  The new segment will be located a half-mile south of Algonquin's existing right of way and will contain a high-pressure 42-inch pipeline – more than *double* the existing capacity.  The new pipeline is 1,600 feet from the nuclear reactors.  It is just 105 feet and 115 feet from two key structures that are necessary to prevent core damage and the major release of radioactive materials to the environment – a vital fact omitted from the Commission's discussion on rehearing.  *See* Rehearing Order at P. 197-98, R.2181, J.A. 1850-51.  The pipeline's proximity to the nuclear plant imperils public safety, with a rupture triggering an incident on a similar order of magnitude as one of the

atomic bombs dropped on Japan in 1945, according to pipeline safety expert Paul Blanch.[24]

The NRC reviewed the potential impact of the pipeline's proximity to the nuclear facilities, but instead of conducting an independent analysis, it adopted the analysis of Entergy, the plant operator, which concluded that the 42-inch pipeline would not jeopardize the safety of Indian Point. Blanch Letter, R.1217, J.A. 521. Entergy's conclusions (and by association, the NRC's) relied on two erroneous assumptions regarding natural gas pipeline safety issues that, as a nuclear plant operator, it has no experience with: (1) that gas flow could be terminated within three minutes in the event of a rupture; and (2) that based on a three-minute release, the maximum impact radius would be 1,195 feet.[25]

Petitioners' expert, Richard Kuprewicz, filed comments in November 2014 questioning the NRC's "unreasonably optimistic assumption" that a pipeline rupture could be addressed in a three-minute time frame. Cortlandt Comments at Kuprewicz Report, R. 1633, J.A. 658. Mr. Kuprewicz also challenged the assumed blast radius based on his review of actual blast radius information from pipeline

---

[24] Blanch Comments, (September 29, 2014), R. 1217, J.A. 521.

[25] *See* Cortlandt Comments (November 21, 2014), submitting Kuprewicz Report (November 3, 2014), R. 1633, J.A. 658.

ruptures compared to calculated blast projections for pipelines of the same size and type. Additionally, while the reactor cores are approximately 1,600 feet from the pipeline, the control room, spent fuel pools, electrical infrastructure and backup cooling materials are closer to the pipeline and are not protected from the effects of a rupture. *Id.*

Based on these concerns, Mr. Kuprewicz urged the Commission to conduct an independent risk analysis of the NRC's conclusions, which the Commission declined to do. By adopting the NRC's conclusions, the Commission erred twice: (1) by failing to address Mr. Kuprewicz's objections; and (2) by relying on the NRC's findings when those findings were under question by legislators and when it lacks expertise over pipelines.

### B. The Commission Did Not Address Concerns Raised by Experts.

On rehearing, the Commission defended its findings regarding safety at Indian Point, relying largely on information gathered at an October 2014 meeting with the NRC staff. Rehearing Order at P. 198, R. 2181, J.A. 1850-51.[26] But the information exchanged at the October 2014 meeting is non-responsive to the criticisms raised by Mr. Kuprewicz regarding the NRC's critical and erroneous assumption regarding Algonquin's ability to address a pipeline rupture. For

---

[26] *See also* Meeting Summary of conference call between FERC and NRC (October 17, 2014), R.1644, J.A. 699.

starters, the NRC staff meeting pre-dated the Kuprewicz Report filed at the Commission, and logically, could not have addressed his concerns. Nor does the Commission point to any evidence by the NRC or otherwise in the record that might explain why the NRC's three-minute assumption was right and Mr. Kuprewicz's opinion was not accurate. Because the Commission failed to address the petitioners' objections regarding pipeline safety that "on their face [are] legitimate, its decision can hardly be classified as reasoned," and must be reversed. *PPL Wallingford Energy v. FERC,* 419 F.3d 1194, 1198 (D.C. Cir. 2005) (remanding decision where FERC did not respond to petitioners' claims).

> **1. The Commission Improperly Relied on the NRC's Conclusions Because the NRC's Rulings Were Subject to Criticism and the NRC Is Not an Expert on Pipeline Ruptures.**

The Commission should have disregarded the NRC's findings for two reasons: first, they were the subject of congressional criticism and second, the Commission and not the NRC has expertise over nuclear power plant operations.

> **a. Controversy over NRC Findings.**

As early as October 2014, when the NRC initially determined that the pipeline would not jeopardize public safety, Congresswoman Nita Lowey wrote to the Commission, requesting a safety assessment related to Indian Point. R. 1445, 1545; J.A. 588, 620. Congressional pressure continued; on February 9, 2015, New

York Senators Schumer and Gillibrand sent letters to the Commission, again raising the safety issues and calling for an independent risk assessment of the pipeline project next to Indian Point. R. 1822, 1888, 1911, J.A. 1237, 1678, 1686. Yet, neither the Certificate nor the Rehearing Order mentions these Congressional investigations at all. This Congressional pressure should have been a red flag to the Commission that it needed to further evaluate the NRC's conclusions and make its own findings regarding pipeline safety.

### b. NRC Does Not Deserve Deference.

While the NRC has expertise related to nuclear power plant operations,[27] it is the Commission has expertise over technical pipeline matters such as safety.[28] The proximity of the 42-inch pipeline to the nuclear reactor gives rise to the potential for catastrophic harm not because of operational issues related to the nuclear facility, but rather, because of the NRC's erroneous and overly optimistic assumptions regarding the pipeline blast radius and the amount of time needed to

---

[27] *See Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 217 (1983) ("Pursuant to its authority under the [Atomic Energy] Act, 42 U.S.C. §§ 2071-2075, 2111-2114 (1976 ed. and Supp. V), the AEC, and later the NRC, promulgated extensive and detailed regulations concerning the operation of nuclear facilities and the handling of nuclear materials.").

[28] *Washington Gas Light v. FERC*, 532 F.3d at 930-32 (2008) (according Commission "considerable deference" over technical issues such as source of leakage in local utility's pipeline).

close off a pipeline rupture.  Resolution of this issue requires expertise on pipeline operations – which falls within the Commission's bailiwick – and not nuclear operational issues where the NRC has no expertise.  *See supra* notes 27-28 (describing scope of each agency's respective expertise).

Given both the controversy over the NRC's findings (evidenced by Congressional demands for inquiries) and the NRC's lack of pipeline expertise, the Commission's reliance on *EMR Network v. FCC*, 391 F.3d 269 (D.C. Cir. 2004) as support for its adopting of the NRC's conclusions without independent review or analysis was misplaced.  In *EMR Network*, this Court permitted the FCC's reliance on EPA and outside experts in declining to promulgate new regulations regarding radio-frequency radiation in cell phones.  This Court found FCC's outside reliance justified both because the EPA's expertise on radiation was unchallenged, and the FCC had no expertise whatsoever on radiation.  By contrast, here, the NRC's findings were disputed by the petitioners' experts and by legislators.  More significantly, the NRC lacks expertise on pipeline ruptures, which falls within the Commission's expertise.  *See supra* notes 27-28.

Ultimately, the Commission and not the NRC has a statutory obligation to support its findings that a project will not jeopardize public safety with substantial evidence.  *See* Natural Gas Act, 15 U.S.C. § 717r(b) (stating that findings based on substantial evidence are conclusive).  The NRC's report – which was the subject of

46

legislative inquiries and is rife with erroneous assumptions regarding the pipeline

blast radius and response times (issues that the Commission never itself addressed

even when raised by Petitioners' expert) – simply does not constitute substantial

evidence of project safety. Moreover, this Court need not accord deference to the

Commission's findings of fact regarding safety because the Commission chose to

rely on an outside agency rather than exercising its own expertise. *C.f. B&J Oil &*

*Gas v. FERC*, 353 F.3d 71,76 (D.C. Cir. 2004) (when agency orders involve

complex matters over which they have expertise, "we are particularly reluctant to

interfere with the agency's reasoned judgments.")

Because the Commission's findings regarding project safety are

unreasonable and unsupported by substantial evidence, the AIM Project does not

meet the public convenience and necessity standard under Section 7 of the NGA

and the Certificate must be vacated.

## III.  THE COMMISSION'S ORDER IS ARBITRARY AND CAPRICIOUS BECAUSE IT RELIES ON AN ENVIRONMENTAL REPORT PREPARED BY A THIRD-PARTY CONTRACTOR WITH A CONFLICT OF INTEREST.

Like many federal agencies, the Commission relies on third-party

contractors – identified by and paid for by project applicants and approved by the

Commission – to prepare its EIS.[29]  To avoid conflicts, potential third-party contractors must complete and submit an Organizational Conflict of Interest Statement ("OCI") to demonstrate that they "have no financial or other conflicting interest in the outcome of the project."[30]

The Commission selected NRG to prepare the EIS or EA for the AIM, Atlantic Bridge and Access Northeast projects.[31]  The record of decision does not contain NRG's OCI.  Following approval of the AIM Project, news emerged that "NRG was already working directly for PennEast LLC ("PennEast"), a major pipeline consortium of which Spectra is a member" beginning in 2014 – the same timeframe during which NRG prepared the DEIS for the AIM Project and the EA for Atlantic Bridge.[32]  By working for Spectra on one pipeline project, while preparing a DEIS on its behalf for the AIM, Atlantic Bridge and Access Northeast

---

[29]  *See* FERC Website (discussing third-party contractors), online at http://www.ferc.gov/industries/gas/enviro/tpc.asp.

[30]  Commission Handbook for Using Third-Party Contractors to Prepare Environmental Documents ("Handbook") at 3-21 and 3-45; J.A. 1947 and 1971.

[31]  *See* FERC Letter approving use of pre-filing process and third-party contractor for AIM. R.2, J.A. 55.

[32]  *See* "Contractors Hired by FERC to Review a New Spectra Pipeline did not Disclose Work for FERC," desmetblog.com/2016/05/26/revealed-contractors-hired-ferc-review-new-spectra-energy-pipeline-work-spectra-related-project.

projects, Algonquin/Spectra violated the Commission's third-party contractor regulations.

The Commission's Handbook asks whether there are "conflicting roles (including potential financial involvement) which might bias a contractor's judgment in relation to its work for the Commission." Handbook at 4-4, J.A. 1980. The Handbook notes that "These may include work for the applicant on this project, or for applicant or another energy firm in the same general project area, especially if the work is for a similar project." *Id.* at n.9. And the Commission's Handbook also requires that the "offeror must similarly avoid agreeing to perform any function for another company on a similar project in the same geographic area, and over the same time period if the facilities would be located in the same area or if there could be a perception that there would be a conflict." *Id.*

NRG is performing work for a company – the PennEast consortium – of which Spectra is a partner. Moreover, the PennEast project has a "major interconnect" with the Algonquin pipeline system, according to PennEast's own materials. This relationship clearly falls within the Commission's own definitions of an OCI for a third-party contractor. Because of this conflict, the FEIS does not comply with CEQ regulations concerning Agency Responsibility, specifically 40 C.F.R. § 1506.5(b), which requires that the agency (the Commission) "make its own evaluation of the environmental issues and take responsibility for the scope

and content of the [EA]." This situation is at least as egregious as the situation in *Colorado Wild, Inc. v. United States Forest Service,* 523 F. Supp. 2d 1213 (D. Colo. 2007), where the court found that communications between the agency's third-party contractor and the applicant raised sufficiently serious and difficult questions as to support a preliminary injunction against the agency's determination. Notably, in the present case, there has been no disclosure of the conflict of interest and certainly no discussion in the DEIS or FEIS of any efforts the Commission undertook to cure the harm that arose because of NRG's conflict.

Because of NRG's conflict of interest, the Commission's FEIS is inherently unreliable. The public's ability to rely on the Commission's independence and the independence of its third-party contractors has been seriously compromised in this case.

Moreover, and of equal importance, the usual presumptions of regularity and impartiality of an agency's findings[33] do not exist here. Therefore, in addition to the Court vacating and remanding the Certificate in its entirety on the basis of this OCI, it must also view with a skeptic's eye each and every conclusion in the environmental review – from the decision to segment review and ignore

---

[33] *See e.g.*, *Louisiana Ass'n of Independent Producers v. FERC*, 958 F.2d 1101, 1111 (D.C. Cir. 1992).

cumulative impacts, to the findings regarding project safety – rather than applying

a deferential standard of review.[34]

## CONCLUSION

Wherefore, for the foregoing reasons, the Petitioners respectfully request

that this Court find that the Commission's Certificate Order and Rehearing Order

are arbitrary, capricious and unsupported by substantial evidence, and vacate the

Certificate or, in the alternative, remand the Certificate for further proceedings

consistent with the Court's order.

---

[34] This Court has jurisdiction to entertain the conflict of interest argument, which was not raised on rehearing.  Section 717r(b) of the NGA provides that "[n]o objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing *unless there is reasonable ground for failure so to do.*" (emphasis added).  Petitioners had reasonable grounds for not raising the conflict issue because the conflict was concealed.  Because NRG's OCI – which the Commission's own regulations require to be filed – is not part of the record (*see* the Certified Index of the Record filed by the Commission with the Court on May 13, 2016), Petitioners had no way of knowing whether NRG had a financial interest in Spectra's other projects.  This information did not come to light until a recent investigation by the *DeSmog Blog* that was conducted a month ago. Because information on NRG's conflict was not available until that time, Petitioners had reasonable grounds for not raising the issue on rehearing.

Respectfully submitted,

/s/ Rebecca F. Zachas
Jeffrey M. Bernstein, Esq.
Rebecca F. Zachas, Esq.
BCK LAW, P.C.
271 Waverley Oaks Road, Suite 203
Waltham, MA 02452
(617) 244-9500
rzachas@bck.com
*Attorneys for the Town of Dedham,
Massachusetts*


/s/ Carolyn Elefant
Carolyn Elefant, Esq.
Alexander English, Esq.
LAW OFFICES OF
CAROLYN ELEFANT, PLLC
2200 Pennsylvania Ave., NW, 4th Fl.E
Washington, D.C. 20037
(202) 297-6100
Carolyn@carolynelefant.com
*Counsel to Riverkeeper, Inc., and
Environmental and Community
Petitioners (Coalition)*

Dated: December 15, 2016

## CERTIFICATE OF COMPLIANCE

I certify that Petitioners' Initial Brief is in compliance with Fed. R. App. P. 28(a)(11); and Fed. R. App. P. 32 (a)(7)(C), and this Court's Briefing Order. The brief was prepared using 14-point Times New Roman, a serif font. The brief contains 10,953 words as calculated by my word processing system, which includes footnotes. The City of Boston Delegation Brief is, according to its Certificate of Compliance, 9,821 words, for a total word count of 20,774, which is under the 21,000-word count allotted for both briefs.

Respectfully submitted,

*/s/ Carolyn Elefant*
Carolyn Elefant, Esq.
Alexander English, Esq.
LAW OFFICES OF
CAROLYN ELEFANT, PLLC
2200 Pennsylvania Ave. NW 4th Flr.E
Washington, D.C. 20037
(202) 297-6100
Carolyn@carolynelefant.com
*Counsel to Riverkeeper, Inc., and*
*Environmental and Community*
*Petitioners (Coalition)*

## CERTIFICATE OF SERVICE

I hereby certify that on December 15, 2016, I electronically filed the foregoing Petitioners' Initial Brief with the United States Court of Appeals for the D.C. Circuit through use of the appellate EM/ECF system and served copies of the foregoing via the Court's CM/ECF system on all ECF-registered counsel.

Respectfully submitted,

*/s/ Carolyn Elefant*
Carolyn Elefant, Esq.
Alexander English, Esq.
LAW OFFICES OF
CAROLYN ELEFANT, PLLC
2200 Pennsylvania Ave., NW, 4th Fl.E
Washington, D.C. 20037
(202) 297-6100
Carolyn@carolynelefant.com
*Counsel to Riverkeeper, Inc., and*
*Environmental and Community*
*Petitioners (Coalition)*